U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

2014 APR 14 A 10: 41

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

v.          No. 13-cr-28-01-SM

KURT SANBORN

PLEA AGREEMENT

Pursuant to Rule 11 (c) (1) (B) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, John P. Kacavas, the United States Attorney for the District of New Hampshire, and the defendant, Kurt Sanborn, and the defendant's attorney, Bjorn Lange, Esq., enter into the following Plea Agreement:

1. The Plea and The Offense.

The defendant agrees to plead guilty counts one, two, and three of the indictment which charges him with wire fraud under 18 U.S.C. § 1343, mail fraud under 18 U.S.C. § 1343, and bank fraud under 18 U.S.C. § 1344, respectively. In exchange for the defendant's guilty pleas, the government agrees to the non-binding sentencing stipulations that are identified in paragraph 6 of this agreement, and to recommend that the defendant be sentenced to minimum period of incarceration for the applicable guideline sentencing range as determined by the sentencing court.

2. The Statutes and Elements of the Offenses.

Title 18, United States Code, Section 1343 provides, in relevant part:

> Whoever, having devised and intending to devise any scheme or artifice
> . . . for obtaining money . . . by means of false or fraudulent pretenses,
> representations or promises, transmits or causes to be transmitted by means of
> wire . . . communication in interstate commerce, any writings . . . for the purpose
> of executing such scheme or artifice . . . [shall be guilty of an offense].

1

The defendant understands that the offense has the following elements, each of which the government would be required to prove beyond a reasonable doubt at trial:

First, the defendant knowingly and willingly participated in a scheme or artifice to obtain money through the use of false or fraudulent pretenses, representations or promises,

Second, the defendant acted with specific intent to defraud, and

Third, the scheme or artifice involved the use of interstate wire communications.[1]

Title 18, United States Code, Section 1341 provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . [and] for the purpose of executing such scheme or artifice or attempting to so to do . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service , or deposits or causes to be deposited any matter or thing whatever to sent or delivered by any private or commercial interstate carrier, or . . . knowingly causes to be delivered by mail according to the directions thereon . . . any such matter or thing shall be [guilty of an offense].

The defendant understands that the mail fraud offense has the following elements, each of which the government would be required to prove beyond a reasonable doubt:

First, the defendant engaged in a scheme and artifice to defraud or to obtain money by false and fraudulent pretenses, representations or promises;

Second, the defendant knowingly and willfully participated in the scheme with the knowledge of its fraudulent nature and a specific intent to defraud; and

Third, in execution of the scheme, the defendant used or caused the use of mails as specified in the Indictment.[2]

Title 18, United States Code, Section 1344 provides, in relevant part:

---

[1] *United States v. Appolon*, 2013 WL 1798339 (C.A. 1 (Mass.)) at p. 3.

[2] *United States v. Hebshie*, 549 F.3d 30, 35-36 (1st Cir. 2008).

> Whoever knowingly executes, or attempts to execute, a scheme or artifice to defraud or to obtain any of the moneys [or] funds . . . owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises [shall be guilty of an offense].

The defendant understands that the bank fraud offense has the following elements, each of which the government would be required to prove beyond a reasonable doubt at trial:

> First, the defendant engaged in a scheme or artifice to defraud or to obtain money from a financial institution by means of materially false statements or misrepresentations;

> Second, the defendant acted knowingly and with a specific intent to defraud; and

> Third, at the time of the offense, the deposits of financial institution were insured by the Federal Deposit Insurance Corporation.[3]

3. Offense Conduct.

The defendant stipulates and agrees that if this case proceeded to trial, the government would prove the following facts and those facts would establish the elements of the offense beyond a reasonable doubt:

Counts One and Two

In May 2003, the defendant and his wife, Kimberly (from whom he is now divorced), signed a contract to buy a home located at 1093 Union Street in Manchester, New Hampshire ("the Manchester Property"), for $569,900. Shortly after the contract was signed, the defendant asked a business associate, Frank Catapano, for a $500,000 personal loan to buy the Manchester Property. The defendant promised to repay the loan when a home the defendant owned in Dunstable, New Hampshire, was sold.

---

[3] *United States v. Moran*, 312, F.3d 480 (1st Cir. 2002); and *United States v. Kenrick*, 221 F.3d 19, 30 (1st Cir. 2000) (en banc), *cert denied*, 531 U.S. 1042 (2000)).

On May 20, 2003, Catapano and his brother-in-law, Paul Cucinatti, each contributed $250,000 to the $500,000 loan. On the same day, the defendant and Kimberly signed a promissory note that required them to repay the entire $500,000 loan before June 16, 2003, and a $500,000 first mortgage on the Manchester property for Catapano and Cucinatti's benefit ("existing mortgage") was recorded at the Hillsborough County Registry of Deeds.

In June 2003, the defendant told Catapano that the sale of the Dunstable home had been delayed due to a problem with a lien on the property. As a result, Catapano and Cucinatti agreed to extend the $500,000 loan and lease the Manchester Property to the defendant until the Dunstable home was sold.

On August 8, 2003, the defendant issued separate $250,000 checks to Catapano and Cucinatti. The checks were drawn on an account that belonged to the defendant's consulting business, The Sanborn Group, both checks were returned for insufficient funds.

On September 30, 2003, the defendant and Kimberly signed a contract to buy a second home in Gilford, New Hampshire, for $685,000. After that contract was signed, the defendant hired Lynn Martin, a mortgage broker from First Call Mortgage Company, to acquire financing for the transaction. Martin quickly determined that banks were not willing to loan money to Kimberly due to her poor credit history.

In approximately October 2003, Martin submitted separate applications for two loans to a mortgage company, First Mortgage Banc ("FMB"), that was owned by First Bank, a federally insured financial institution. One application, requested a $230,750 loan secured by a mortgage on the Manchester Property. The other application, requested a $444,250 loan secured by a mortgage on the Gilford property. Neither application disclosed the existing mortgage on the

Manchester Property or the defendant's $500,000 debt to Catapano and Cucinatti, because the defendant did not provide this information to Martin.

The defendant's loan applications were reviewed by an FBM underwriter, Kellie Santomassimo. Due to the defendant's unimpressive credit history the loan requests were referred to Santomassimo's supervisor and FMB's senior vice president, Chris Anderson. Anderson offered to finance 100% of the defendant's acquisition of the Gilford property through a $185,000 loan secured by a first mortgage on the Manchester property and $500,000 loan secured by a first mortgage on the Gilford property.

Thereafter, the existing mortgage was discovered during a preliminary title search on the Manchester Property that was conducted by a title company working for FBM. On November 3, 2003, a letter bearing Catapano's forged signature was faxed from the defendant's business office in Newport, Rhode Island, to Martin's office in Manchester, New Hampshire. The letter falsely states:

> *To Whom It May Concern:*
>
> *Please be advised that a mortgage was executed on May 27, 2003 between Kurt and Kimberly Sanborn and myself on the property located at 1093 Union Street, Manchester, New Hampshire.*
>
> *It is my understanding that Mr. Sanborn would like to have me subordinate this lien in order to draw on the equity in said property.*
>
> *This letter shall serve as my intention to accommodate Mr. Sanborn's request and subordinate my lien on this property should a mortgage be approved on his behalf.*

After a copy of the forged letter was delivered to FMB, Anderson agreed to provide the $185,000 loan secured by the Manchester Property and the $500,000 loan secured by the Gilford Property to the defendant if the existing mortgage was discharged.

5

At 12:16 p.m. on November 24, 2003, a Discharge of Mortgage bearing Catapano and Cucinatti's forged signatures was recorded at the Hillsborough County Registry of Deeds. Cucinatti's name is misspelled on the document. In addition, the forged signatures of John DeMartin (as a witness) and Elaine G. Poirier (as a Notary) appear on the last page document. [4]

The defendant acquired bogus evidence that Catapano and Cucinatti no longer possessed a first mortgage security interest in the Manchester Property by causing the Hillsborough County Registry of Deeds to mail a certified copy of the fraudulent Mortgage Discharge to his residence in Dunstable, New Hampshire.

After a certified copy of the fraudulent Mortgage Discharge was provided to FMB, a $185,000 equity loan that was purportedly secured by a first mortgage on the Manchester property was provided to the defendant by FMB on December 1, 2003. In addition, on December 3, 2003, a $500,000 loan secured by a first mortgage on the Gilford property was provided to the defendant by FMB on December 3, 2003.

Count Three

Acting on behalf of The Sanborn Group in February 2004, the defendant submitted an application to Community Bank and Trust Company ("CBTC") for a two year $150,000 commercial loan. As part of the application process, on February 27, 2004, a copy of the Warranty Deed for FMB's first mortgage on the Manchester property was provided to CBTC. Thereafter, the defendant's application for the $150,000 loan was approved by CBTC's vice president, Frank Teas, subject to several conditions, including CBTC's receipt of a second mortgage on the Manchester Property. Before the loan closed, a lawyer acting on behalf of CBTC, Patricia Mellon, conducted a title search on the Manchester property, which revealed that FMB had a first mortgage security interest in the Manchester property.

---

[4] On the same day, Sanborn made a legitimate $140,000 loan payment to Cucinatti.

As a condition of receiving the $150,000 loan, the defendant signed and submitted a number of documents to the bank that falsely and fraudulently concealed Catapano and Cucinatti's security interest in the Manchester property, falsely and fraudulently reported that FMB owned a first mortgage on the property, and, falsely and fraudulently stated that in exchange for the $150,000, CBTC would receive a second mortgage on the Manchester property. Relying on these material misrepresentations, the proceeds from the $150,000 loan were disbursed to the defendant on March 19, 2004.

4. Penalties, Special Assessment and Restitution.

The defendant understands that the maximum penalties for the offenses are:

A. A 30 year period of imprisonment (18 U.S.C. §§ 1343, 1341 and 1344);

B. A fine of $1,000,000 (18 U.S.C. §§ 1343, 1341 and 1344); and

C. A five year period of supervised release (18 U.S.C. §§ 3559 (a) (5) and 3583 (b) (3)). The defendant understands that his failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring him to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release.

The defendant also understands that he will be required to pay a special assessment of $300 ($100 for each count of conviction) at or before the time of sentencing; and that the Court may order him to pay restitution to the victims of the offense, pursuant to 18 U.S.C. §§ 3663 or 3663A.

5. Sentencing and Application of the Sentencing Guidelines.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines. The defendant further understands that he has no right to withdraw his guilty plea if

the applicable advisory guideline range or his sentence is other than he anticipated, except as expressly provided in this Plea Agreement.

The defendant also understands that the United States and the United States Probation Office shall:

A. Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

B. Respond to questions from the Court;

C. Correct any inaccuracies in the pre-sentence report;

D. Respond to any statements made by him or his counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range within the advisory Sentencing Guidelines that he may have received from any source is only a prediction and not a promise, and is not binding on the United States, the Probation Office, or the Court, except as expressly provided in this Plea Agreement.

6. <u>Sentencing Stipulations and Agreements</u>.

Pursuant to Fed. R. Crim. 11(c) (1) (B), the parties agree that the amount of the loss caused by the offenses for purposes of U.S.S.G. § 2B1.1 (b) (1) (E) is not more than $200,000.

The defendant understands that the Court is not bound by the foregoing agreement and, with the aid of a pre-sentence report, the court will determine the facts relevant to sentencing. The defendant also understands that if the Court does not accept this agreement, such rejection by the Court will not be a basis for the defendant to withdraw his guilty plea.

The defendant understands that the government may argue that other sentencing enhancements should be applied to this case, and he is free to object to them.

8

The parties are free to make recommendations with respect to a period of imprisonment, a fine, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

7. <u>Acceptance of Responsibility</u>.

The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

    A. Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;

    B. Challenges the United States' offer of proof at any time after the plea is entered;

    C. Denies involvement in the offense;

    D. Gives conflicting statements about his involvement in the offense or is untruthful with the Court, the United States or the Probation Office;

    E. Fails to give complete and accurate information about his financial status to the Probation Office;

    F. Obstructs or attempts to obstruct justice, prior to sentencing;

    G. Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

    H. Fails to appear in court as required;

    I. After signing this Plea Agreement, engages in additional criminal conduct; or

    J. Attempts to withdraw his guilty plea.

The defendant understands and agrees that he may not withdraw his guilty plea if, for any of the reasons listed above, the United States does not recommend that he receive a reduction in his sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that he has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and he has assisted the United States in the investigation or prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

8. <u>Waiver of Trial Rights and Consequences of Plea</u>.

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him. The defendant also understands that he has the right:

    A. To plead not guilty or to maintain that plea if it has already been made;

    B. To be tried by a jury and, at that trial, to the assistance of counsel;

    C. To confront and cross-examine witnesses;

    D. Not to be compelled to provide testimony that may incriminate him; and

    E. To compulsory process for the attendance of witnesses to testify in his defense.

The defendant understands and agrees that by pleading guilty he waives and gives up the foregoing rights and that upon the Court's acceptance of his guilty plea, he will not be entitled to a trial.

The defendant understands that if he pleads guilty, the Court may ask him questions about the offense, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers will be used against him in a prosecution for perjury or making false statements.

9. <u>Acknowledgment of Guilt; Voluntariness of Plea</u>.

The defendant understands and acknowledges that he:

A. Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because he is guilty;

B. Is entering into this Plea Agreement without reliance upon any promise of benefit of any kind except as set forth in this Plea Agreement;

C. Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

D. Understands the nature of the offenses to which he is pleading guilty, including the penalties provided by law; and

E. Is completely satisfied with the representation and advice received from his undersigned attorney.

10. <u>Scope of Agreement</u>.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-party federal, state or local authority. The defendant also acknowledges that no representations have been made to him about any civil or administrative consequences that may result from the guilty plea. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved. The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant. In that regard, the defendant and the government agree that the federal civil tax

liability that stems from the conduct underlying the offenses is a matter defendant will separately address with the Internal Revenue Service.

11. <u>Collateral Consequences</u>.

The defendant understands that as a consequence of his guilty plea he will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

12. <u>Satisfaction of Federal Criminal Liability; Breach</u>.

The defendant's guilty plea, if accepted by the Court, will satisfy his federal criminal liability in the District of New Hampshire arising from his participation in the conduct that forms the basis of the indictment in this case. The defendant understands that if, before sentencing, he violates any term or condition of this Plea Agreement, engages in any criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw therefrom.

13. <u>Waivers</u>.

   A. Appeal.

The defendant understands that he has the right to challenge his guilty plea and/or sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly and voluntarily waives his right to challenge on direct appeal:

   1. His guilty plea and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

   2. The sentence imposed by the Court if within, or lower than, the guideline range determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of his rights does not operate to waive an appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel in the negotiation of this Plea Agreement or at the sentencing hearing.

B. Collateral Review

The defendants understands that he may have the right to challenge his guilty plea and/or sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or 2255. By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to collaterally challenge:

1. His guilty plea, except as provided below, and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

2. The sentence imposed by the Court if it falls within, or lower than, the guideline range as determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of his right to collateral review does not operate to waive a collateral challenge to his guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel in the negotiation of the Plea, Plea Agreement or the sentencing hearing. The defendant's waiver of his right collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any

records pertaining to the investigation or prosecution of the case(s) underlying this Plea Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

D. Appeal by the Government

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government to pursue an appeal that is authorized by law.

14. No Other Promises.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

15. Final Binding Agreement.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

16. Agreement Provisions Not Severable.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

|  |  |
|---|---|
| | JOHN P. KACAVAS |
| | United States Attorney |
| Date: 4-14-14 | By: *(signature)* |
| | Robert M. Kinsella |
| | Assistant United States Attorney |
| | Bar No. 273315 |
| | 53 Pleasant St., 4th Floor |
| | Concord, NH 03301 |

The defendant, Kurt Sanborn, certifies that he has read this 15-page Plea Agreement and that he fully understands and accepts its terms.

Date: 4/11/14                                          *(signature)*
                                                       Kurt Sanborn, Defendant

I have read and explained this 15-page Plea Agreement to the defendant, Kurt Sanborn, and he has advised me that he understands and accepts its terms.

Date: 7/11/14                                          *(signature)*
                                                       Bjorn Lange, Esq.
                                                       Attorney for Kurt Sanborn