**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1-15-2015

```
                UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  13-CR-28-01-SM
            v.                  *  September 5, 2014
                                *  11:58 a.m.
        KURT SANBORN            *
                                *
* * * * * * * * * * * * * * * * *




            TRANSCRIPT OF RECORDED BAIL HEARING
          BEFORE THE HONORABLE ANDREA K. JOHNSTONE



APPEARANCES:



For the Government:     Robert M. Kinsella, AUSA
                        U.S. Attorney's Office




For the Defendant:      Bjorn R. Lange, Esq.
                        Federal Defender Office




Probation:              Sean Buckley
```

I  N  D  E  X

WITNESS:              Direct    Cross    Redirect    Recross

KURT SANBORN:

By Mr. Kinsella    12

1          P R O C E E D I N G S

2          THE CLERK:  The Court has before it for

3     consideration a bail hearing in criminal case 13-CR-28-1-SM,

4     United States of America versus Kurt Sanborn.

5          THE COURT:  Attorney Lange, I understand that our

6     hearing today relates to a request that Mr. Sanborn be

7     released on conditions, and I understand that there have been

8     some preliminary conversations and discussions about the

9     possibility of reaching some type of an agreement on proposed

10    conditions of release.

11         The question that comes to my mind that I would

12    like the government to respond to, and also you to respond to

13    before we go too far down the road, is about the pending

14    matters in Rhode Island.  And my understanding is that there

15    either is a hearing scheduled today or there was a hearing

16    scheduled today that might resolve those issues.

17         MR. LANGE:  The resolution of the Rhode Island case

18    is pretty much tied to the resolution here.

19         The defendant's family obtained an attorney,

20    William Devereaux.  He filed an appearance in the Rhode

21    Island District Court in Warwick, which is where the case is

22    pending, and the defendant has executed a Power of Attorney

23    which authorizes Attorney Devereaux to resolve the case at

24    least up to a final resolution.

25         The local -- the attorney general, myself and the

1   government have all been in extensive discussions.  I don't

2   think I've ever had a case where I've spent as much time on a

3   cell phone as I did in this case.

4         Whatever happens in the Rhode Island District

5   Court, the parties agreed up here that there will be a no

6   contact order as a condition of whatever comes out of this

7   court involving my client having no contact with Mary

8   Catherine Wharton, Kelly Wharton, Michael Wharton, Alex

9   Wharton and Barbara Jo Marcotte.  These were various people

10  involved in the Rhode Island matter.

11        It's also been agreed that -- except to go down and

12  see Attorney Devereaux in Providence and possibly to see a

13  prospective employer -- the defendant is not to go to Rhode

14  Island at all -- a condition not to go to Rhode Island at

15  all.  That may be subject to change.  It's going to be

16  subject to change.  It will either be because the parties

17  agree to a modification or because (inaudible) requesting a

18  modification.

19        What we're saying right now is that whatever

20  happens in Rhode Island -- and I think Rhode Island may be

21  resolved today because I spoke to Devereaux last night.  I

22  got an e-mail from him this morning.  He is down in court in

23  Warwick.  He told me that he may be able to resolve the

24  matter by telephone today, but, you know, obviously --

25        THE COURT:  We can't predict that.

1          MR. LANGE:  That's right.

2          THE COURT:  What time was that hearing scheduled

3     for?

4          MR. LANGE:  It was on for a pretrial at 9:00

5     o'clock this morning, and I told him we had a hearing here at

6     11:30.  He was thinking that he would do some kind of a phone

7     resolution.  I don't know how they do it in Warwick, but if

8     it's like here there's not going to be a final order, if

9     that's your question.  I don't think there's going to be a

10    final order out of the Rhode Island case today unless there's

11    some magic technology.

12         THE COURT:  All right.

13         MR. LANGE:  But what I'm also telling you is that

14    all matters before the Rhode Island court are essentially

15    being addressed here because these admissions are admissions

16    in terms of having no contact with those people.

17         THE COURT:  Attorney Kinsella.

18         MR. KINSELLA:  I have spoken to Attorney Devereaux

19    this morning.  He has told me that he and Peter Clark, who is

20    the city solicitor and also the prosecutor for the offenses

21    in Rhode Island, had an appointment to be in court at 10:30

22    this morning.  They didn't know when the case would be

23    called, but they were scheduled to arrive in court at 10:30.

24         I have not heard from them about what resolution or

25    what procedures are to follow from that appearance today.

1          THE COURT:  Okay.  Because originally as I started

2    processing and thinking about where we are right now, I

3    thought it might help all of us to have more clarity on

4    whether the Rhode Island matters were finally resolved today

5    or not, and let me just share what my other thinking is.

6          I think it's helpful to have a no contact order,

7    and obviously in this case that would have been what I was

8    looking for if we were going to be considering release on

9    conditions, but I think it would be helpful to know whether

10   that matter in Rhode Island was finally resolved or not.

11         The other thing that would be helpful to me as I

12   consider whether or not release is appropriate, and dealing

13   with the issue of Mr. Sanborn potentially going to Rhode

14   Island at all for any purpose because counsel can come to

15   Massachusetts to consult with his client as well, or to New

16   Hampshire, whatever needs to be done.  They can do it by

17   phone.  The employment in Rhode Island is something that I

18   would like to have more information on.

19         MR. LANGE:  What I would propose today -- the one

20   thing that I'm asking is that he be allowed to go to

21   Providence to get his phone and some of his property that

22   Attorney Devereaux has, and that he be allowed to stop in

23   Cumberland to see a prospective employer, and otherwise he

24   would not be in Rhode Island at all, unless we can convince

25   probation, the government, and ultimately you, that he's got

1    a legitimate reason to be there and until we can satisfy

2    probation that there are secure means to guarantee that he's

3    going to do what he's supposed to do and nothing more and

4    nothing less.

5            THE COURT:  Even as to that contact, though -- I

6    mean, picking up personal property, there's got to be another

7    way for us to get that property to Mr. Sanborn.

8            But in terms of giving him an opportunity if

9    there's a job that he needs to go talk to somebody about, I

10   would just like to have probation be given the opportunity to

11   speak to whoever that entity is, or that employer is, before

12   he's even going down to talk to them.

13           MR. LANGE:  Yes.  I see what you're saying.

14   I'll (inaudible) --

15           THE COURT:  So --

16           MR. LANGE:  Do you want us to clarify these

17   matters?

18           THE COURT:  Yeah.  That's what I'm thinking.

19   You've already waited 30 minutes for me to get out here, and

20   I'm very respectful of your time.  I also know that Mr.

21   Sanborn is here and is anxious to know what's going to be

22   happening to him.

23           My inclination is that ideally if you all could

24   perhaps try to reach out to Attorney Devereaux.  If Mr.

25   Sanborn needs to be part of that through a telephone

1   conference call or something, if it looks like that's going

2   to help to resolve or move the Rhode Island matter along, we

3   will try to accommodate that by -- if we know what time Mr.

4   Sanborn needs to be available later on this afternoon, we'll

5   try to have a conference phone in here so that he can

6   participate by phone, if that's necessary.  If not, then we

7   don't need to do that.

8          But ideally what I would really like to know is

9   where are we with Rhode Island, and then based on the

10   conversations we're having today -- I mean, my inclination

11   is -- it doesn't sound like there's a real pressing need for

12   him to be in Rhode Island at all, but maybe you can convince

13   me otherwise, but I do want to give probation the opportunity

14   to speak to whoever this prospective employer is in Rhode

15   Island before I will even consider allowing him to go to

16   Cumberland, Rhode Island, for that purpose.

17          MR. LANGE:  We'll follow up on that.

18          THE COURT:  Okay.  Thank you.  I appreciate it very

19   much.  Thank you for your patience.

20          Thank you, Mr. Sanborn.

21          MR. LANGE:  So we're in recess for the time being?

22          THE COURT:  Very good.  We will recess, and I'll

23   wait to hear back from you.

24          Let Ms. Sackos know, and we'll try to schedule this

25   for later on today.  I'm going to be here all day, so we can

1    do this as late in the afternoon as we need to.  Thank you.

2              (RECESS)

3              THE CLERK:  Court is back in session in the matter

4    of the United States of America versus Kurt Sanborn,

5    13-CR-28-01-SM.

6              THE COURT:  Good afternoon.

7              MR. KINSELLA:  Good afternoon, Judge.

8              THE COURT:  Okay.  We had a call that was off the

9    record earlier today with Attorney Devereaux down in Rhode

10   Island, and I understand that there are some developments

11   that have happened since we had that call.

12             I don't care which one of you starts, whichever one

13   wants to.

14             MR. KINSELLA:  Okay.

15             THE COURT:  I would like to hear about that call

16   and also, first, what the government's thinking is on the

17   pending motion, and then we can proceed from there.

18             MR. KINSELLA:  Thank you, Judge, and thank you for

19   seeing us again this afternoon.

20             After we met in chambers, Attorney Lange and

21   Probation Officer Buckley and I called Attorney Devereaux

22   again to ask him questions regarding the availability of the

23   defendant participating in a court hearing related to Rhode

24   Island matters by video conference.

25             Attorney Devereaux related to us that he wasn't

1   sure whether or not the District Court in Rhode Island had

2   the capability of conducting that type of hearing.  And even

3   if the district court did have that capability, Attorney

4   Devereaux was not able to assure us that the judge in that

5   case would be willing to proceed on that basis given the fact

6   that there's going to be very stringent conditions placed on

7   the defendant with regard to his contact with individuals in

8   Rhode Island, and Attorney Devereaux believed the judge would

9   prefer for the defendant to be present so that the judge

10  could assure himself or herself that the defendant fully

11  understood the consequences of him pleading guilty to the

12  offenses in Rhode Island and what consequences might follow

13  in the event that he violated a no contact order.

14          Further, if there was no video conferencing

15  capabilities available to the judge, we are unsure as to

16  whether or not that judge would agree to go to a different

17  location, the judge's availability and also the prosecutor's.

18  There's a lot of moving parts.

19          So based on that we agreed to proceed based upon

20  some conditions that I would like to present to the Court.

21          THE COURT:  Okay.

22          MR. KINSELLA:  So, Judge, if I could just begin.

23  Attorney Lange and I spent a considerable amount of time over

24  the last couple of days negotiating the terms of conditions

25  that we believe will assure that the defendant will appear in

1    court and will not pose a danger to anyone in the community,

2    specifically Ms. Wharton and her family, and also Bobbie Jo

3    Marcotte.

4              And as part of that, the defendant has agreed to

5    make certain admissions today in court regarding a no contact

6    order that was issued by a Rhode Island state court judge on

7    May 29 of 2014, and a no trespass order that was issued by a

8    local police department in Rhode Island on May 20, 2014.

9              And so, with your permission, I would like to

10   proceed with regard to those conditions right now by asking

11   the defendant some questions, if it's okay with you.

12             THE COURT:  Okay.  That's fine.  I just want folks

13   to make sure that they understand, if that's the way that you

14   want to proceed, that I haven't made a decision as to whether

15   or not the conditions that you're proposing are going to be

16   acceptable to the Court.

17             MR. KINSELLA:  Understood.

18             THE COURT:  And so I want to just make sure that

19   both parties understand that that's still where I am, because

20   I don't want Mr. Sanborn to be making admissions on the

21   record here with the expectation that by doing so he is going

22   to have the conditions that are under consideration approved.

23             MR. LANGE:  We accept there is no quid pro quo.  We

24   understand that.

25             THE COURT:  Okay.

1          MR. KINSELLA:  Okay.  Thank you very much.

2          So, Mr. Sanborn, I just have a couple questions for

3   you.

4          THE COURT:  We need to swear the defendant.

5          MR. KINSELLA:  Oh, I'm sorry.

6          THE COURT:  Thank you.

7                         KURT SANBORN

8          having been duly sworn, testified as follows:

9          MR. KINSELLA:  Thanks, Judge.

10                      DIRECT EXAMINATION

11   BY MR. KINSELLA:

12      Q.   Mr. Sanborn, I would like you to state whether or

13   not you agree or disagree with the following statements,

14   okay?

15          On May 20, 2014, Cathy Wharton obtained from the

16   East Greenwich Police Department an order that was served

17   upon you that directed you not to be on her property at any

18   time after that date.  Is that true?

19      A.   That was the date it was issued.  That's not the

20   date I was told that.

21      Q.   You have to speak up.

22      A.   That was the date it was issued.  That's not the

23   date that I was told that.

24      Q.   Not the date that you what?

25      A.   I was told that.

1      Q.   Okay.  Did you receive a directive from the East

2  Greenwich Police Department not to go to Cathy Wharton's

3  residence and go onto her property?

4      A.   I had a phone call from a police officer; yes, sir.

5      Q.   Okay.  And after you received that directive from

6  the police department, did you go on her property in

7  violation of that order on May 23, 2014?

8      A.   Yes.  I went and gave her dog a collar.

9      Q.   Okay.  In violation of that order, a no trespass

10  order, did you also go on her property on May 26, 2014?

11      A.   I believe on that date, sir, that I wasn't in the

12  town.

13      Q.   Okay.  On that date did you go to her home, ring

14  her doorbell, and then walk away from her home and then get

15  into your car and drive away?

16      A.   Let's see, the 26th?

17      MR. LANGE:  You're not certain of the date?

18      THE DEFENDANT:  No, I'm not certain.

19      A.   Yes.

20      Q.   No.  Don't agree with me just because you want to

21  be released.  On a date after May 20, 2014 -- at some day

22  after May 20, 2014, did you return to Ms. Wharton's home on

23  her property, ring her doorbell, walk away, get in your car

24  and drive away?

25      A.   Yes.

1    Q.   Okay.  In addition, on May 29, 2014, a state court

2  judge in Rhode Island issued an order directing you to have

3  no contact with Ms. Wharton; is that correct?

4    A.   A temporary restraining order, yes.

5    Q.   Yes.  And did you receive a copy of that order?

6    A.   I did.

7    Q.   And did you understand that you would have no

8  contact with Ms. Wharton once you received that order?

9    A.   Yes.

10   Q.   Okay.  And despite that, on June 4, 2014, did you

11 go to Ms. Wharton's place of employment?

12   A.   Yes.

13   Q.   And did you follow her to her residence or her

14 neighborhood on that day in your car following her car?

15   A.   I didn't actually follow her car, but I was in her

16 neighborhood, yes, and I turned around in her neighborhood.

17   Q.   Did you wait for her to leave her employment?

18   A.   Yes, because I didn't want any contact.  That's

19 true, yes.

20   Q.   And did you wait for her to get into her car on

21 that day?

22   A.   I didn't see her get into her car.  I saw her down

23 the street.

24   Q.   Were you in the parking lot of her place of

25 employment?

1      A.   Yes.

2      Q.   Did you see her leave her place of employment and

3  get into her car?

4      A.   I didn't see her get into her car, but I saw her

5  leave the parking lot, yes.

6      Q.   And did you purposely follow her car towards her

7  residence?

8      A.   I didn't purposely follow her car, but I did go to

9  her residence, yes.

10     Q.   Why did you go to her residence?

11     A.   Because I was told that my lawn tractor was in the

12 driveway, and I was just going to see if it was there, and I

13 turned right into a driveway up the street and turned and I

14 left into her neighborhood.  I did do that, yes.  The report

15 says that, too.

16     Q.   Excuse me?

17     A.   The police report says it that way, too.  I turned

18 around in her neighborhood.  I didn't go to her house,

19 though.

20     Q.   You stopped before her house?

21     A.   Yes, and turned around in the driveway of the first

22 house on the right and left.

23     Q.   And you followed her near her house for the purpose

24 of what?

25     A.   Because I have a John Deere lawn tractor there.  I

have a John Deere lawn tractor there, and I was told that it

was in the driveway.  I wanted to see if it was in the

driveway and not secured.

Q.   On that day when you stopped by the local police

department --

A.   Yes.

Q.   -- did you have in your car documents that belonged

to Ms. Wharton that you were not entitled to have possession

of?

A.   I had -- yes.  I had documents that were from her,

yes.

Q.   Excuse me?

A.   Yes, I did have documents.

MR. KINSELLA:  Okay.  Judge, that's sufficient for

me now.

THE COURT:  Okay.

MR. LANGE:  I have nothing to add in terms of

questioning the defendant.

MR. KINSELLA:  It was my expectation, Judge, that

Mr. Sanborn was prepared today during this hearing to admit

in unequivocal terms that he violated the terms of the no

contact order that was issued on May 29, 2014, and that's an

important part -- an important reason why the government had

agreed to propose certain conditions for him to be released,

because it's important for us to know that he understands the

1  significance of the order and his responsibility to abide by

2  it, which also relates specifically and directly to any

3  orders he receives in this court to follow those orders.

4        His answers to those questions today are in my view

5  ambiguous, and based upon that -- unless he chooses to

6  restate his position, I would seek a continuance so that I

7  can bring witnesses here to present testimony regarding his

8  activities involving Ms. Wharton and her family after that

9  order of protection would have been issued.

10       THE COURT:  Yeah, I'll tell you that based on the

11 responses that we received today I'm really not interested in

12 having Mr. Sanborn recast those so that they may or may not

13 appeal to the government in a different way.

14       He, I think, appreciated the questions.  He

15 expected and anticipated what the questions were that you

16 were going to ask him.  We spent a lot of time today getting

17 ready for this.  And as you both have represented to me,

18 you've been working very hard over the last week or so trying

19 to put this case into a position so that Mr. Sanborn could

20 appear in Rhode Island and take care of the legal matter

21 that's before him pending there.

22       My understanding is that all of those matters were

23 intended to come up to New Hampshire and that this was

24 perhaps an accommodation to Mr. Sanborn and an opportunity to

25 perhaps look at this case in a different way.

1          I am not comfortable approving conditions of

2     release based on the responses that you received today, and I

3     am not comfortable in giving Mr. Sanborn a second chance to

4     answer those questions differently.

5          MR. LANGE:  Your Honor --

6          THE COURT:  I'm happy to have this matter

7     continued, if that's necessary.

8          MR. LANGE:  Your Honor --

9          THE COURT:  Attorney Lange.

10         MR. LANGE:  The defendant was prepared to admit his

11    responsibility for the misdemeanors.  He's indicated through

12    Attorney Devereaux he's going to be pleading guilty down

13    there next Friday, and he did not know that we were going to

14    have colloquy, but he understood that he had to admit his

15    liability, and I think he did admit that he did follow Cathy

16    Wharton after he saw her leave her place of work and that was

17    a violation of the order.

18         I don't think he evaded responsibility.  I don't

19    think he's been evasive or ambiguous.

20         THE DEFENDANT:  May I, your Honor?

21         I didn't anticipate this, and I'm a little nervous,

22    but I can tell you wholeheartedly I admit to doing this.  I

23    admit to it wholeheartedly.

24         Your Honor, I had a six-and-a-half year

25    relationship with this woman and I cared about her and her

1    family very much, and it's over.  I deal with that now and I

2    admit to it, and I would like to try to adhere to this and

3    move on and do my best, and I will.  I will be successful in

4    that.

5              THE COURT:  I appreciate that.  Unfortunately, your

6    responses and the explanations that you provided for your

7    failure to comply with the orders that were presented to you

8    don't give me any confidence that you're going to adhere to

9    the terms and conditions of the supervised release as they

10   were presented to me today.

11             THE DEFENDANT:  If I may, your Honor.

12             Again, I wasn't in any way, shape or form prepared

13   for any of this today, and I would normally -- that's why I'm

14   hesitant, because my attorneys are here.

15             I have already stated that I'm prepared to agree to

16   all the terms in the letter.  And I will tell you, to the

17   best of my ability as I stand here, you're looking at a man

18   that will not -- has no intention of going to Rhode Island or

19   doing anything again.

20             I frankly owe it to my family to fix this and to

21   restart.  And the fact that I'm given an opportunity to go

22   and stay with my mother and have some of those natural

23   supports again in my life -- my family is all right there

24   within a mile of the house -- it's going to be a huge help to

25   me, in addition to the other pieces that the government is

1   willing to do for me.

2         THE COURT:  Well, what I'm going to recommend is

3   that if the -- if Attorney Lange and Attorney Kinsella want

4   to continue to have conversations, we have until Friday of

5   next week, which is when the hearing is scheduled, and I am

6   open to continuing the discussion.

7         But for the purpose of today, based on what I've

8   heard, I'm not prepared to agree to conditions of release.

9   Thank you.

10         (Conclusion of hearing at 3:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, Susan M. Bateman, do hereby certify that the

4   foregoing transcript is true and accurate to the best of

5   my knowledge and belief.

6

7

8   Submitted: 10-17-14          *Susan M. Bateman*
                                 **SUSAN M. BATEMAN, LCR, RPR, CRR**
9                                LICENSED COURT REPORTER, NO. 34
                                 STATE OF NEW HAMPSHIRE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25