UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

v.  13:cr-28-01-SM

KURT SANBORN

GOVERNMENT'S SENTENCING MEMORANDUM

INTRODUCTION

After pleading to fraud offenses that caused an actual loss of $200,000, the defendant has asked the Court to sentence him to a 21-month term of incarceration (9 months less than the low end of the advisory guideline sentencing range ("GSR") that the parties' expected in this case) and two years of supervised release. This statutory variance from the advisory GSR is appropriate, the defendant says, because his properly calculated criminal history ("CHC") over-states the risk that he will re-offend; the assistance he provided to prison officials who investigated a prison assault in July 2015 suggests that he is not likely to re-offend; and he is frightened to return to a federal prison "to the point of emotional trauma." Def. Mem. p. 7.

The government respectfully objects to this request and urges the Court to impose a 27-month term of incarceration and three years of supervised release, achieved through a statutory variance that accounts for the delay in prosecuting the case.

OFFENSE CONDUCT

In May 20, 2003, the defendant used a $500,000 personal loan from two individuals, Lenders A and B, to buy a home in Manchester, New Hampshire ("the Manchester property"). In exchange, Lenders A and B received a first mortgage ("the lenders' mortgage") on the Manchester property which was recorded at the Hillsborough County Registry of Deeds.

1

On September 30, 2003, the defendant signed a contract to buy a second home in Gilford, New Hampshire, for $685,000. In October 2003, a mortgage broker submitted two loan applications to a mortgage company for the defendant. One application requested a $230,750 loan secured by the Manchester property. The other requested a $444,250 loan secured by the Gilford property. Neither application disclosed the lenders' mortgage or the defendant's $500,000 personal debt to Lenders A and B because the defendant did not provide this information to the mortgage broker.

After reviewing the applications, the mortgage company's senior vice president, Chris Anderson, agreed to finance the defendant's purchase of the Gilford property through separate loans for $185,000 and $500,000 secured by mortgages on the Manchester and Gilford properties, respectively.

On November 3, 2003, after the lender's mortgage was discovered during a title search on the Manchester property, a letter containing Lender A's forged signature was faxed from the defendant's business office to the mortgage broker. The letter falsely states, in part:

> *It is my understanding that Mr. Sanborn would like to have me subordinate this lien in order to draw on the equity in [the Manchester property].*
>
> *This letter shall serve as my intention to accommodate Mr. Sanborn's request and subordinate my lien on this property should a mortgage be approved on his behalf.*

After a copy of the forged letter was delivered to the mortgage company, Anderson agreed to provide the requested financing if the lenders' mortgage was discharged. On November 24, 2003, a Discharge of Mortgage bearing Lenders A and B's forged signatures was recorded at the Hillsborough County Registry of Deeds. On the same day, the defendant repaid some of the money he owed to Lenders A and B by issuing a personal check for $140,000 to Lender A.

After a certified copy of the fraudulent Mortgage Deed was provided to the mortgage company, the defendant received from the mortgage company a $185,000 loan secured by an illusory first mortgage on the Manchester property and a $500,000 loan secured by a first mortgage on the Gilford property.

In February 2004, the defendant submitted an application for a $150,000 loan to a federally insurance bank ("the bank"), using the Manchester property as collateral. During the application process, a copy of the Warranty Deed for the mortgage company's first mortgage on the Manchester property was provided to the bank. Consequently, in exchange for the $150,000 loan, the bank received an illusory second mortgage on the Manchester property.

In October 2004, the defendant sold the Manchester property without disclosing the lenders' mortgage to the new owners. The defendant used the proceeds of this transaction to pay-off the mortgage company's $185,000 loan and the bank's $150,000 loan.

In October 2005, after the fraudulent Mortgage Discharge was discovered by Lenders A and B, the defendant sold the Gilford property for $745,000 and used this money to pay-off the mortgage company's $500,000 loan and make a $160,000 payment to Lender A, reducing the actual loss caused by the offenses to $200,000.

DEFENDANT'S CRIMINAL HISTORY

On November 14, 2011, the defendant admitted sufficient facts to a charge that he operated a motor vehicle while under the influence of alcohol in September 2007. The case was continued without a finding and dismissed on November 13, 2008.

On November 19, 2009, the defendant received a 30-month prison sentence after he pled guilty to a federal wire fraud offense that involved the theft of more than $300,000 during a period that partially overlaps the instant offenses.

On October 22, 2014, the defendant was sentenced to one year of probation after he pled nolo contendere to a charge that he violated a no trespass order that was issued by a Rhode Island court for the protection of the defendant's former girlfriend.

ADVISORY SENTENCING GUIDELINES

The parties agree that the offenses in this case are grouped under U.S.S.G. §3D1.2(d); that the base offense level for the offenses is 7 under U.S.S.G. §2B1.1(a)(1); that a 12-level increase is applied under U.S.S.G. §2B1.1(b)(1)(G) because the offenses involved a sentencing loss of $360,000; that the defendant is not entitled to a 3-level reduction under U.S.S.G. §3E1.1 because he was convicted of another offense, violation of a no trespass order, while waiting to be sentenced in this case; that the defendant's CHC is III; and that total offense level 19 in CHC III yields an advisory guideline sentencing range ("GSR") of 37-46 months.

The plea agreement mistakenly includes a non-binding stipulation that the amount of the loss caused by the offense is $200,000, which would lead to a 10-level increase under U.S.S.G. §2B1.1(b)(1)(F). The parties erroneously applied the lower loss amount because they failed to recognize that the defendant repaid $160,000 to Lender A *after* the offenses were detected. *See* U.S.S.G. 2B1.1, n. 3(E) (directing that the amount of loss shall be reduced by . . . money returned to a victim before the offense was detected).

Consistent with the non-binding stipulation regarding the amount of the loss, the government respectfully requests that the Court's analysis of the proper sentence for this case begin at offense level 17, which yields an advisory GSR of 30-37 months in CHC III.

ARGUMENT

The ten-year statute of limitations for the oldest offense to which the defendant pled guilty would have expired on November 2, 2013. The indictment was filed on April 10, 2013,

approximately 7-months before that deadline. The defendant does not contend that the delay in prosecution was caused by the government's bad faith, because there is no basis for him to do so.[1] Rather, the defendant claims that the assignment of criminal history points to his previous wire fraud and OUI convictions, while proper, produces a criminal history category that overstates the risk that he will re-offend because those crimes were committed after the offenses for which he will be sentenced.[2] *See United States v. Correa*, 114 F.3d 314, 316 (1st Cir. 1997) ("criminal history points can profoundly affect the length of a sentence").

This argument must fail because it is the number, frequency, and type of previous crimes that a defendant commits, not the order which they are committed, that informs whether he is likely to reoffend. In addition, as the Court is aware, a defendant's CHC is one of many facts that contribute to a proper assessment of a defendant's risk to reoffend. For example, while on supervised release for his previous wire fraud conviction and on pre-trial release for this case, the defendant engaged in conduct - that did not affect the calculation of his CHC - that strongly suggests he will commit additional crimes:

---

[1] The government did not receive any information about the offenses charged in this case until shortly after the defendant was sentenced for his previous wire fraud offense in 2009. After collecting evidence that corroborated the allegations, the government met with the defendant pursuant to the terms of a proffer letter. During that meeting, the defendant admitted that he knowingly used the forged Mortgage Discharge to obtain the $185,000 and $500,000 loans from the mortgage company. Shortly after that meeting, the defendant agreed to plead guilty, but then changed his mind. During the next several months, the government collected the evidence that was necessary to successfully try the case. It took a significant period of time to obtain copies of documents associated with the $185,000 and $500,000 loans because the mortgages assigned to the loans were sold many times, and the government had a difficult time finding the mortgage company's vice president, Anderson, who no longer works or lives in New Hampshire.

[2] In fact, the defendant's previous wire fraud offense was completed before the offenses in this case.

- On June 4, 2014, he violated the terms of a restraining order that was issued by a Rhode Island court by driving to his former girlfriend's place of employment and following her to her residence, PSR ¶51A;

- On November 7 and 8, 2014, he violated a condition of his pre-trial release that required him to remain in his residence between 7:00 p.m. and 7:00 a.m., by returning to his home after 7:00 p.m., PSR ¶¶ 6C and 6D; and

- On December 24, 2014, the defendant violated a condition of his pre-trial release when, after receiving permission from his supervising probation officer to attend religious services from 3:00 p.m. to 5:00 p.m., he ignored the restriction and drove to Cumberland, Rhode Island, to attend a holiday party, where he was arrested during the early morning hours of December 25. PSR ¶¶ 6D – 6H.

Nevertheless, the age of the offenses for which the defendant will be sentenced provide a basis for the Court to impose a prison sentence that is less than 30 months. In *United States v. Saldana*, 109 F.3d 100 (1st Cir. 1997), the defendant argued that the district court misunderstood its authority to downwardly depart due to a delay in the prosecution of the case. In addressing this issue, *Saldana* recognized that a delay in prosecution that is not the result of government's bad faith can be a mitigating sentencing factor:

> If the district court meant that only a bad faith delay could support a departure downward, it arguably overstated the law. Under the guidelines, a delay in prosecution can have various adverse effects on a defendant's sentence; for example, apart from the lost opportunity for a concurrent sentence, it can drastically affect criminal history if in the meantime the defendant is convicted of other crimes. See U.S.S.G. 4A1.1. Or, a mitigating circumstance-which might otherwise affect sentencing-might disappear. See U.S.S.G. 5K2.0. It seems to us possible that someone with time and ingenuity could construct a case where a careless or even innocent delay produced sentencing consequences so unusual and

> unfair that a departure would be permissible. [After all,] the ordinary accidents of accelerations or delay are part of the fabric of criminal proceedings.

*Saldana*, 109 F.3d at 104.

In light of this guidance, as a matter of fairness, the government respectfully requests that the Court impose a prison sentence of 27-months, due to the delay in the prosecution of this case.

The defendant also contends that the assistance he provided to prison officials who investigating a prison assault in July 2015 "demonstrates his ability to make the correct choice and reflects positively on the lack of likelihood that he will re-offend." Def. Mem., p. 6. While commendable, as a measure of the likelihood that the defendant will reoffend, the defendant's decision to cooperate is overwhelming outweighed by his criminal history and his unwillingness or inability to follow the rules of a court.

The defendant's final reason for seeking a reduction to his sentence is that he is "frightened to the point of emotional trauma," Def. Mem., p. 7, at the prospect of returning to a federal prison because he was (allegedly) victimized by a correctional officer while serving the prison sentencing imposed for his previous wire fraud conviction. The defendant does not provide any information to support the allegation that he was "victimized," and the government is not aware of any evidence that he was. Additionally, the psychologist who conducted a competency evaluation of the defendant, Eric Drogan, did not find these allegations particularly credible. Rather, in his competency report, Dr. Drogan stated that the defendant's "emotional liability and his *self –depiction* as a victim of abuse under conditions of confinement lead to the recommendation that he be afforded psychological treatment as soon as possible." Def. Mem. p. 7 (emphasis added).

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to 27-month term of incarceration and three years of supervised release. Such a sentence would be "sufficient but not greater than necessary" to protect the public, promote respect for the law, deter others from engaging similar conduct and, most importantly, to deter the defendant from committing additional crimes. *See* 18 U.S.C. § 3553(a).

Dated: December 12, 2015

        Respectfully submitted,

        DONALD FEITH
        Acting United States Attorney

By:    /s/ Robert M. Kinsella
        Robert M. Kinsella
        Assistant United States Attorney
        Bar No. 273315
        53 Pleasant St., 4th Floor
        Concord, New Hampshire 03301
        (603) 225-1552
        robert.kinsella@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2015, a copy of this pleading was filed electronically and copies were sent by sent, by electronic mail, to the defendant's lawyer, Michael Ramsdell, and U.S. Probation Officer Sean Buckley.

        /s/ Robert M. Kinsella
        Robert M. Kinsella, AUSA